**HINES, Director General of Railroads, et al. v. CLARENDON LEVEE DIST. et al.**

(District Court, E. D. Arkansas, W. D. December 8, 1919.)

1. **Constitutional law** ⬤⟾297—**Act requiring railroad to elevate track unconstitutional, as depriving of property without due process.**

    Sp. Acts Ark. 1919, p. 121, enlarging the Clarendon levee district to include the track of the St. Louis & Southwestern Railway Company and territory beyond, and requiring company to raise its roadbed within the district for the expressed purpose of protecting the city from overflow and the track itself from inundation, in consequence of which, it is recited, "the public traffic upon said railroad has been interrupted, to the great detriment of the public welfare," held unconstitutional, as depriving the company of its property without due process of law, it appearing that the raising of the track within the district would cost upward of $150,000, and would not aid in preventing interruption of traffic, because the track for three miles beyond was upon a trestle and subject to the same overflow, nor would it afford any protection to the added portion of the district beyond.

2. **Statutes** ⬤⟾181(2)—**Determination of constitutionality.**

    In construing a legislative act enacted under the police power of a state, where its validity is attacked as depriving one of constitutional rights, the courts will not be controlled by the form of the statute, but by the possible results of its operation.

3. **Railroads** ⬤⟾87—**Construction of tracks within police power of states.**

    While under its police power a state may require railroads to change their tracks, when necessary for the protection of life or for the good of the public generally, there must be fair and reasonable ground for it, and the acts required to be done must have some effective relation to the end sought to be accomplished.

4. **Constitutional law** ⬤⟾241—**Statute singling out one railroad, and requiring elevation of tracks, unconstitutional.**

    A state may not arbitrarily select a particular railroad company, and require it to raise its tracks at a particular place, for the avowed pur-

pose of preventing the obstruction of traffic by overflow, where such track is subject to overflow at the same time at other places, and where other roads through the state are subject to the same obstructions.

**5. Statutes ⚖══66—Validity of class legislation.**

A state may enact class legislation, but such an act must apply to all of that class similarly situated, subject to reasonable exceptions based on some reasonable grounds, and what is a reasonable exception is a question to be finally determined by the courts.

In Equity. Suit by Walker D. Hines, as Director General of Railroads, and the St. Louis Southwestern Railway Company, against the Clarendon Levee District and others. ˙ Decree for complainants.

J. C. Hawthorne, of Jonesboro, Ark., and Daniel Upthegrove, of St. Louis, Mo., for plaintiffs.

G. Otis Bogle, of Brinkley, Ark., and Rose, Hemingway, Cantrell & Loughborough, of Little Rock, Ark., for defendants.

TRIEBER, District Judge. The plaintiffs seek to enjoin by this action the enforcement of sections 2, 3, and 4 of the Special Act of the General Assembly of the state of Arkansas, entitled "An act in aid of the Clarendon Levee District, and for other purposes," approved February 13, 1919, published in Special Acts of Arkansas, 1919, p. 121.

Section 1 of the act provides that the Clarendon levee district as it has existed since 1890 is legalized as a levee district, duly organized under the general laws of the state governing levee districts, and then describes the boundaries, which enlarge the district by adding thereto the roadbed of the railway company, and in addition thereto several hundred feet east of the roadbed.

Section 2 makes it the duty of all railroads crossing the levees of said district to raise their grades to the height of said levees, and a failure to do so within six months after the passage of the act subjects them to a fine of $100 for every day, to be recovered by either a criminal prosecution or a civil action for the benefit of the levee district.

Section 3 recites that the plaintiff railway company, at the time of the organization of the levee district (which was in 1890), agreed that it would build its track high enough to serve as a levee, protecting said city of Clarendon from overflow, and in consideration of said agreement it has been excused from the payment of levee taxes to the district. It then proceeds that:

"It is hereby ascertained and declared that the levee of the said St. Louis Southwestern Railway is not of the height required to protect said city of Clarendon from overflow, nor is it of a height to protect the track itself from inundation by the waters of White and Cache rivers, so that, in consequence, the public traffic upon said railroad has been interrupted to the great detriment of the public welfare."

It then provides that the railroad is required within six months from the passage of the act to raise its track within said levee district to the height of the levee of the said district, to the end that said track may be above overflow and the traffic upon said railroad may not be interrupted thereby; upon failure to comply with this requirement it shall

⚖══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

be deemed guilty of a misdemeanor, and subjected to a fine of $100 for each day.

Section 4 provides that any railroad company, which has made a contract such as set out in section 3, and fails to comply with such contract, shall be guilty of a misdemeanor, and subject to a fine of $100 for each day it shall fail to raise and maintain said levee at that height, within six months after the passage of the act.

The complaint, after setting out the jurisdictional facts and the ownership of the road by the plaintiff railway company, and that it is now in the possession and under the control of the plaintiff Walker D. Hines, as United States Director General of Railroads, and the provisions of the special act of 1919, charges that a raise of the grades of the railroad within that levee district, as required by the act, would cause an expenditure of $200,000, and would not benefit the railway or its property, either directly or indirectly. It attacks the constitutionality of the act, setting up the fact that it is an interstate railroad, running through the states of Missouri, Arkansas, and Louisiana, and that the act is a taking of its property without due process of law. They deny the existence of a contract as set out in section 3 of the act, or that in consideration of such an agreement the railway has been excused from the payment of the levee taxes. They also deny that the Legislature ascertained that the roadbed of the plaintiff was not of the height required to protect the city of Clarendon from overflow, or that the height of its tracks was not sufficient to protect them from inundation. They allege that the increased height of the levee as required by the act cannot possibly be constructed within the period of six months, if the act is valid, and they pray for an injunction to restrain the enforcement of the act by the defendants, the levee district, the directors of the district, the Attorney General of the state, and the prosecuting attorney for that circuit.

The answer denies that the cost of compliance with the act would cause any great expense, or that the act places any burden upon interstate commerce, but, on the contrary, tends to facilitate the same. It then sets up that the floods of White river are becoming continually higher, and the raising of said track is essential to the proper discharge of the functions of said railroad company as a public carrier of passengers and trade. It is then alleged that on July 7, 1890, the county court of Monroe county, in which the town of Clarendon is located, duly laid off said levee district in conformity with the laws of the state; that by the terms of said judgment the roadbed of the said railroad company is embraced in the district and was subject to taxation for levee purposes; that by making said track solid it could be made to serve as a portion of the levee, and thereupon a contract was entered into between the levee district and the railroad company, by which the latter undertook to maintain the said track as a portion of the levee; in consideration thereof the levee district was to refrain from collecting any levee taxes from the railroad property; that for more than 28 years that contract has been enforced, and for all of that time the railroad company has been excused from the payment of levee taxes, because its track was a portion of the levee, and whenever there was

danger of overflow the railroad company has held that levee as long as possible with sand bags and other devices, when its tracks at nearby points were under water and traffic suspended in consequence of said track being inundated, in consideration of being relieved of paying said levee taxes; that when, in 1918, the railway company refused to raise its track to meet the high stages of the water in White river, the levee district undertook to lay upon the railway track of the railway company the levee taxes, whereupon it pleaded in defense this contract to be excused from the payment of taxes. They also pleaded an estoppel by reason of these acts.

The answer also sets up a counterclaim, asking for specific performance of the contract. To this counterclaim the plaintiffs filed a reply, denying that the roadbed of the railroad company was embraced within the levee district and subject to taxes, or that it undertook to maintain the roadbed as a portion of the levee, or that it ever pleaded the alleged contract in defense of an attempt by the levee district to levy a tax upon its property. They also pleaded that, if there was such a contract, it would be void, as it was not to be performed within one year from the making thereof, and was not reduced to writing; that the terms would be so indefinite and uncertain as to make it impossible to determine what the rights and liabilities of the parties were intended to be granted or imposed thereby; that it would be lacking in mutuality, as there was no agreement upon the part of the levee district to maintain its levee, and no consideration moving to the railway company; and that the levee district was without authority and could not lawfully make such a contract.

They further claim that the alleged contract, if it ever existed, ought not to be specifically performed by a court of equity, because (1) its terms are vague, indefinite, and uncertain; (2) that the defendants have a plain and adequate remedy at law to enforce the rights, which may accrue to them by reason of the existence of said alleged contract, in an action for breach thereof; (3) that the terms of said alleged contract are unconscionable, oppressive, and unreasonable, unfair, and iniquitous, for the reason that the specific performance thereof would compel the railway company to spend $200,000 to accomplish a result which could be accomplished by the district at an expense not to exceed $25,000; (4) the terms of said contract as alleged show that it is perpetual; that the act of the Legislature in attempting to impose jurisdiction upon a court of equity of specific performance is unconstitutional, as an unlawful invasion of the judicial powers by the Legislature.

It then pleads that, even if there was such a contract as is pleaded in the answer, the same was breached in the year 1894, and continually thereafter, in failing to comply with the terms of such alleged contract, and that during the time intervening between 1894 and the time of the institution of this suit the railway company has expended vast sums in the improvement of said property, which will be lost, if it is now compelled to raise its roadbed, structures, and buildings as prayed by the defendants, and also that the right of action thereunder is barred by the statutes of limitation and laches.

So far as section 2 of the act is involved, the railway company does not cross the levee of that district, as the levee at the present time extends no further than the west side of the railway embankment; there being no levee east of it. Nor is it necessary to pass upon the validity of section 4 of the act, in view of the finding of fact made by the court as to the existence of such a contract. This leaves for consideration only the relief asked against the provisions of section 3 of the act.

[1] The statement in the act that there was a contract is clearly erroneous, as the evidence conclusively establishes that there was no such contract, either in writing or verbal. The undisputed evidence also established that the levee district as created in 1890 did not include the railroad embankment on which its tracks are laid, and, of course, was not subject to taxation by the levee district. Mr. Jeffries, who was a director of the levee district from October, 1890, shortly after the creation of the district, until the passage of the act in controversy in 1919, testified that the reason for not taxing the railroad for levee taxes was due to the fact that the directors did not consider it in the district. It is true that its station and some side tracks were within the district, and were never assessed for taxation. But this was the fault of the officers of the district. Their failure to assess this property cannot act as an estoppel of the railway company, if it never claimed an exemption under a contract, express or implied. The evidence shows that it never did.

This leaves for consideration whether section 3, requiring the railway to raise its roadbed and tracks to a height equal to that of the levee of the district, upon the grounds set out in the act, that "it is insufficient to protect the track from inundation by the waters of White and Cache rivers, and that by reason thereof the public traffic upon said railroad has been and is likely to be interrupted to the great detriment of the public welfare," is valid.

The court finds that the evidence establishes that the district, as described in the act of 1919, extends the levee district for over 700 feet east of the railroad embankment, while the original district, as created in 1890 by the county court of Monroe county, only extended the district to the west side of the railway embankment, and did not include the railroad embankment or any lands east of it; that the town of Clarendon is on the north side of White river; that the railway crosses the river at that point on a bridge erected by it, proceeding in a southerly direction; that south of the bridge the White river bottoms are as low as, or perhaps lower than, the town for three miles; that the tracks for these three miles are on a trestle of the same height as the tracks in the town, and that, if the floods of White river are sufficiently high to inundate the roadbed in the town at its present height, it would cover the tracks on the trestle, and interfere with the traffic of the road to the same extent as if the roadbed in the town was under water; that the levee district, when established in 1890, was for the purpose of building a levee to protect the town of Clarendon. It began at the railroad embankment near the bank of the river, and then ran west and around the town, somewhat in the shape of a crescent, to the embankment at the north end of the town, thus making,

with the railroad embankment, a complete levee around the town, protecting it fully from what was, until the high water of 1916, the highest rise of White river.

[2] In construing a legislative act, enacted under the police power of a state, when its validity is attacked as depriving one of the protection of the rights secured by the national Constitution, the courts will not be controlled by the form of the statute, but the possible results of its operation. Yick Wo v. Hopkins, 118 U. S. 356, 373, 6 Sup. Ct. 1064, 30 L. Ed. 220; Merchants' Bank v. Pennsylvania, 167 U. S. 461, 463, 17 Sup. Ct. 829, 42 L. Ed. 236; Bailey v. Alabama, 219 U. S. 231, 31 Sup. Ct. 145, 55 L. Ed. 191; Mountain Timber Co. v. Washington, 243 U. S. 219, 237, 37 Sup. Ct. 260, 61 L. Ed. 685, Ann. Cas. 1917D, 642; Ludwig v. Western Union Tel. Co., 216 U. S. 146, 162, 30 Sup. Ct. 280, 54 L. Ed. 423; Standard Oil Co. v. Graves, 249 U. S. 389, 394, 39 Sup. Ct. 320, 63 L. Ed. 662.

The act of 1919 enlarges the district, so as to include, not only the entire right of way of the railway, but several hundred feet east of it, and not within the corporate limits of the town of Clarendon. If the railway tracks are raised to the height necessary to protect them and the town against overflow, when the height of the river reaches that of 1916, or exceeds it, or if the water is as high as it was in 1890, the lands in the district east of the railway embankment will still be unprotected from overflows, as they are at present, and subject to overflow. In that case the owners of these lands would derive no benefit whatever from the levee, and to tax them for levee purposes, as required by the act, would clearly be unlawful. Myles Salt Co. v. Board of Commissioners, 239 U. S. 478, 36 Sup. Ct. 204, 60 L. Ed. 392, L. R. A. 1918E, 190. If, on the other hand, the district constructs a levee on the east boundary line of the district, so as to protect these lands, the tracks of the railway would not be subject to overflow, and consequently its traffic would not be interrupted during high water.

The undisputed evidence also establishes the fact that the raising of the railway embankment within the levee district would not prevent stoppage of traffic, in case the overflow waters reach the height they did in 1916, as its tracks south of the bridge run for three miles through the same White river bottoms, where the ground is no higher, if as high, as in the town of Clarendon. These tracks are on a trestle for that distance. Neither the act, nor any other statute of the state, requires that part of the tracks to be raised; they will therefore be overflowed, when the river reaches the height it did in 1916, and thus prevent the operation of trains over that part of the line, including the town of Clarendon, to the same extent as if the tracks in the town were inundated. The act, therefore, fails to accomplish the sole object for which it is claimed it was enacted and should be sustained.

[3] While under the police power a state may require railroads, at their own expense, to abrogate grade crossings, erect viaducts, or even change tracks, if necessary for the protection of life and health, or for the good of the public generally, as distinguished from those of a particular class, there must be a fair and reasonable ground for it. A mere arbitrary act, although exercised under the police power, cannot

be sustained. Lawton v. Steele, 152 U. S. 133, 137, 14 Sup. Ct. 499, 38 L. Ed. 385; Dobbins v. Los Angeles, 195 U. S. 223, 236, 25 Sup. Ct. 18, 49 L. Ed. 169; Missouri Pacific R. R. v. Nebraska, 217 U. S. 196, 30 Sup. Ct. 461, 54 L. Ed. 727, 18 Ann. Cas. 989; Chicago, etc., R. v. Wisconsin, 238 U. S. 491, 501, 35 Sup. Ct. 869, 59 L. Ed. 1423, L. R. A. 1916A, 1133. And this is the rule of law in the state of Arkansas. Louisiana & Arkansas R. R. v. State, 91 Ark. 358, 121 S. W. 284. It is impossible to escape the conclusion that the real object of the act is to require the railroad to protect, at its expense, the town of Clarendon from overflow. The act states that:

"It is hereby ascertained and declared that the levee of the said St. Louis Southwestern Railway is not of the height required to protect said city of Clarendon from overflow."

[4] Assuming that a state may require railroads to maintain their tracks, in sections of the state subject to overflow, sufficiently high to prevent interruption of the traffic by reason of overflows, whether it is an intrastate or interstate railroad, the question here involved is: May it single out one railroad, when the evidence establishes—or, even in the absence of evidence to that effect, the court is bound to take judicial notice of the fact—that there is not a railroad system in the state which does not traverse, in part, sections of the state which are at times, some more, others less, frequently, overflowed from the waters of the Mississippi, White, Arkansas, Red, Black, Cache, St. Francis, L'Anguille, and Ouachita rivers, and smaller streams of the state? The testimony shows that there are a number of other sections of this company's railroad subject to overflow, which prevent traffic. It is also shown that the tracks of the Rock Island in Arkansas are subject to overflows, which prevent the operation of its trains at a number of places.

This raises the further question whether a state may select one small section of a track of a trunk line, when the undisputed evidence shows that the raising of that part of the tracks to a height above any known overflow would still leave the road, and even this section, subject to the same interruption of traffic on the line of the railway, and the town sought to be protected, as if left at the present height?

[5] It is undoubtedly true that the state has a right to enact class legislation, but such an act must apply to all of that class similarly situated, subject to reasonable exceptions, based on some reasonable grounds. What a reasonable exception is, is a question to be determined by the courts. It is equally well settled that a state may not select one of a class to the exclusion of all others in the same class. Soon Hing v. Crowley, 113 U. S. 703, 709, 5 Sup. Ct. 730, 28 L. Ed. 1145; Yick Wo v. Hopkins, 118 U. S. 356, 369, 6 Sup. Ct. 1064, 30 L. Ed. 220; Hayes v. Missouri, 120 U. S. 68, 71, 7 Sup. Ct. 350, 30 L. Ed. 578; Lawton v. Steele, 152 U. S. 133, 137, 14 Sup. Ct. 499, 38 L. Ed. 385; Gulf, Colorado & Santa Fé Ry. v. Ellis, 165 U. S. 150, 165, 17 Sup. Ct. 255, 41 L. Ed. 666; Cotting v. Kansas City Stockyards, 183 U. S. 79, 112, 22 Sup. Ct. 30, 46 L. Ed. 92; Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 559, 22 Sup. Ct. 431, 46 L. Ed. 679.

In Soon Hing v. Crowley, Mr. Justice Field said:

"The discriminations which are open to objection are those where persons engaged in the same business are subjected to different restrictions, or are held entitled to different privileges under the same conditions."

In Lawton v. Steele the court said:

"To justify the state in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The Legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts."

Counsel for defendants in their brief say:

"It is apparent that more may be required of a railroad for the accommodation of a city which furnishes a substantial part of its traffic than would be demanded on behalf of a mere hamlet. Railroads are glad to pay hundreds of millions of dollars for the privilege of entering New York City, and to elevate their tracks or to carry them through expensive tunnels, as may be demanded."

This may be admitted, but how can this apply to the facts in the instant case? An overflow or washout of a railroad track in an uninhabited section, a short distance from a city, will as effectually prevent trains from entering or leaving the city, as if the obstruction was on the tracks in the city.

The evidence also establishes, and the court so finds, that the expense to the railway company, to comply with the provisions of this section of the act would, in view of the high cost of labor at the present time, be at least from $150,000 to $175,000. The evidence on the part of the plaintiff estimates it at $189,720, and to raise the three miles of trestle would cause over $100,000 more expense, while the taxes assessed and collected by the levee district for the building and maintenance of the levee, beginning in 1891 to 1919, inclusive, 28 years, amounted to $27,239.34. This included the expenses incurred by the commissioners and the cost of assessing and collecting the taxes. In Oregon Railroad & Navigation Co. v. Fairchild, 224 U. S. 510, 529, 32 Sup. Ct. 535, 540 (56 L. Ed. 863), it was held:

"Where, however, the proceeding is brought to compel a carrier to furnish a facility not included within its absolute duties, the question of expense is of more controlling importance."

See, also, Chicago, etc., v. Ochs, 249 U. S. 416, 421, 39 Sup. Ct. 343, 63 L. Ed. 679.

Can it be said that to maintain a levee for this particular part of the tracks when by reason of the fact that the tracks adjoining it would still be subject to overflow and prevent traffic at that place, when the river reaches a height sufficient to cover the present tracks in the town of Clarendon, is "included within the absolute duties" of the railway? "The business of a railroad is transportation, and to supply the public with conveniences not connected therewith is no part of its ordinary duty." Great Northern Ry. v. Minnesota, 238 U. S. 340, 345, 35 Sup.

Ct. 753, 754 (59 L. Ed. 1337). It may be proper to add that the evidence shows that since 1885, to the present time, this part of the tracks has only been overflowed twice, in 1890 and 1916. As was said in Holden v. Hardy, 169 U. S. 366, 398, 18 Sup. Ct. 383, 390 (42 L. Ed. 780):

"The question in each case is whether the Legislature has adopted the statute in exercise of a reasonable discretion, or whether its action be a mere excuse for an unjust discrimination, or the oppression, or spoliation of a particular class."

In Barbier v. Connolly, 113 U. S. 27, 31, 5 Sup. Ct. 357, 359 (28 L. Ed. 923), it was said:

"The Fourteenth Amendment, in declaring that no state 'shall deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws,' undoubtedly intended, not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; that all persons should be equally entitled to pursue their happiness and acquire and enjoy property; that they should have like access to the courts of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts; that no impediment should be interposed to the pursuits of any one, except as applied to the same pursuits by others under like circumstances: that no greater burdens should be laid upon one than are laid upon others in the same calling and condition, and that in the administration of criminal justice no different or higher punishment should be imposed upon one than such as is prescribed to all for like offenses."

In the opinion of the court, the effect of section 3 of the act is in violation of the Fourteenth Amendment. Missouri Pacific R. R. v. Nebraska, 164 U. S. 403, 417, 17 Sup. Ct. 130, 41 L. Ed. 489; Central Stockyards Co. v. Louisville & Nashville R. R., 192 U. S. 568, 24 Sup. Ct. 339, 48 L. Ed. 565; Great Northern Ry. v. Minnesota, 238 U. S. 340, 347, 35 Sup. Ct. 753, 59 L. Ed. 1337; Los Angeles Elec. Co. v. Los Angeles (D. C.) 241 Fed. 912, 920, affirmed 251 U. S. 32, 40 Sup. Ct. 76, 64 L. Ed. —— (opinion filed December 8, 1919).